# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **MARIMAR TEJEDOR-DAVILA**, | |
| Plaintiff, | |
| v. | Civil No. 18-1630 (BJM) |
| **COMMISSIONER OF SOCIAL SECURITY**, | |
| Defendant. | |

## OPINION AND ORDER

Marimar Tejedor-Davila ("Tejedor") seeks review of the Commissioner's finding that she is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Tejedor contends the Commissioner's decision should be reversed because the administrative law judge ("ALJ") erred in finding her not disabled at step two of the five-step disability evaluation sequence and because the Appeals Council failed to correct that error, despite additional relevant evidence. Docket Nos. ("Dkts") 3, 17. The Commissioner opposed. Dkts. 14, 21. This case is before me on consent of the parties. Dkts. 4, 7. After careful review of the administrative record and the briefs on file, the Commissioner's decision is **VACATED** and **REMANDED** for further proceedings consistent with this opinion.

## STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v.*

*Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are

so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

Tejedor was born on September 11, 1970. She trained as a nurse and spent most of her career in the healthcare industry. Social Security Transcript ("Tr.") 534–37, 872, 880. She worked as an emergency room nurse, a line operator, and as a quality technician in a pharmaceutical plant. *Id.* Over time, Tejedor developed various ailments, including those related to back, neck, and shoulder pain. Tr. 871.

Tejedor states that her pain stems from a workplace injury exacerbated by subsequent harmful medical procedures. Tr. 537–38. On June 19, 2011, Tejedor was working as a nurse. Tr. 537–38. One of her patients with a mental disturbance had crawled underneath an adjustable bed, and Tejedor was trying to get him out. Tr. 538. She removed the mattress and otherwise tried to get him to emerge, but he did not want to come out from under the bed. *Id.* Instead, he moved towards the bed's motor. *Id.* She lifted the bed, moving repeatedly from left to right, and then began feeling pain. *Id.* The pain moved from her neck to her shoulders and back, and then down to her knees. *Id.*

Tejedor sought treatment, including an injection, administered in September 2011, that, she alleges, failed to produce its intended result. Tr. 537–38. Tejedor reports that the injection inflamed her chest, shoulder, and back; caused swelling in her arm, elbow, and hands; and resulted in her index finger being bent backwards and rendered useless. Tr. 537–38. Then, around late September or early October 2012, Tejedor received another injection in her lumbar region, which, she states, caused her to lose mobility and strength in her hands and feet. Tr. 539. According to Tejedor, after the lumbar injection, she could no longer work as a nurse. Because of weakness and lack of sensitivity in her hands, she could no longer take a patient's blood pressure, grab medications, administer CPR, or "grab the little hand of a baby." Tr. 544. Given the state of her health, she stopped working. Tr. 539.

On March 21, 2013, Tejedor filed for disability benefits, claiming an onset date of October 2, 2012. Tr. 36, 867. She reported the following medical conditions: radiculopathy; left shoulder bursitis and hyperemia; protuberant cervicals at C2-C3, C4-C5; bulky C6-C6; fibromyalgia; high blood pressure; pituitary adenoma; diverticula; and lumbar hypertrophia. Tr. 867, 871.

Tejedor's medical records indicate that, over the course of several years, she frequently sought treatment for back, shoulder, and neck pain, among other complaints. After her accident, she sought treatment through the State Insurance Fund Corporation ("SIF"). Tr. 436–37. Upon her

initial examination on July 12, 2011, a physician found that Tejedor's movements and gait were normal but noted "pain with movement in the upper [illegible] region of the left shoulder, anterior lateral process, and right knee rotation." Tr. 436. Over time, SIF physicians treated Tejedor for pain in the cervical and lumbar region, left shoulder, and right knee. *See, e.g.,* Tr. 427, 432–33. They referred her to a physiatrist and prescribed various medications and physical therapy. *Id.*

On December 1, 2011, Tejedor underwent an MRI that revealed protruding discs at C2-C3, C3-C4, and C4-C5, as well as bulging discs at C5-C6 and C6-C7. Tr. 961. According to Dr. Wanda Benitez, imaging of Tejedor's left shoulder suggested "mild to moderate rotator cuff tendinopathy changes," bursitis, and early AC joint degenerative joint disease "with small undersurface osteophytes at the distal clavicle predisposing to mechanical impingement." Tr. 962.

On December 8, Tejedor saw Dr. Luis Goveo for "neck pain and back pain radiating to the upper and lower extremities." Tr. 957. Electromyogram and nerve conduction studies revealed "reduced amplitude" in left and right median motor nerves as well as in the left and right tibial motor nerves. Tr. 957. A comparison between the left and right tibial motor nerves indicated abnormal left/right amplitude differences. Tr. 957. According to Dr. Goveo, these tests provided evidence of "a bilateral median and tibial motor axonal neuropathy" and "acute right SI radiculopathy." Tr. 957.

On January 24, 2012, Dr. Eduardo Matos Postigo reviewed Tejedor's x-rays, MRI, electromyography results, and nerve conduction studies and determined that Tejedor suffered from the following conditions: cervical/lumbar/sacral strain; left shoulder strain; right knee sprain; left shoulder rotator cuff tendinopathy; left shoulder subacromial and subdeltoid bursitis; disc protrusion at C2-C3, C3-C4, and C4-C5; disc bulge at C5-C6, C6-C7; right S1 radiculopathy; and right knee osteoarthritic changes. Tr. 422. Ongoing treatment with SIF included prescriptions for Cataflam, Norflex, Celebrex, Lodine, and Flexeril; physical therapy; and appointments with a chiropractor, orthopedist, and medical inspector. *See, e.g.*, Tr. 412–20.

On October 2, the alleged disability onset date, Tejedor sought treatment with SIF. A medical professional's note from that visit follows:

> She comes in with an MRI: bursitis and tendinopathy. She received physical therapy and continues with shoulder pain. She was evaluated on September 27, 2012, and received intramuscular injections. Since then, she has been in more pain in her upper back muscles and continues with edema, and the pain radiates to her entire arm, including her hand, with difficulty to lift her arm and [illegible] her hand.

Tr. 326. Tejedor was referred for further evaluation. *Id.* On October 4, Tejedor went to SIF again and was referred to a pain specialist. Tr. 325. She saw Dr. A. De la Cruz, whose notes are illegible. Tr. 324. On October 9, Tejedor sought additional treatment. Tr. 414. She reported that an orthopedist had administered an intramuscular injection and that since then, she had experienced increased shoulder pain, which extended to her hand. *Id.* The SIF physician prescribed Celebrex, Cataflam, and Toradol and referred Tejedor to a physiatrist. *Id.* On October 11, Tejedor sought treatment again, complaining that the pain had worsened. Tr. 412. On October 20, she saw a pain specialist, who referred Tejedor for a bone scan. Tr. 321. On October 23, Tejedor sought treatment again for severe pain in the left shoulder and cervical/lumbar region. Tr. 410. She was referred to an orthopedist and anesthesiologist and prescribed physical therapy. Tr. 410. On October 26, Tejedor saw a pain management specialist, Dr. Marcos R. Perez Toro, whose notes are largely illegible but appear to recognize protrusions at C2-C3, C3-C4, and C4-C5 and indicate possible "shoulder-hand syndrome (RSD)." Tr. 320. Tejedor sought treatment again on October 31, stating that she was experiencing too much pain to tolerate physical therapy. Tr. 413.

On the evening of November 1, Tejedor sought urgent care at Industrial Hospital for neck and shoulder pain. Tr. 317. Although hospital notes are partly illegible, Dr. R. Rivera, a physiatrist, evaluated Tejedor and noted the following: "exquisite tenderness/spasm in c-spine area[,] shoulder [illegible] tenderness; [illegible], stiffness in C-D area; C-MRI C2-C3, C3-C4, C4-C5 protrusions[,] C5-C6, C6-C7 bulges." Tr. 302. Dr. Rivera's diagnosis was multilevel degenerative

disc disease and cervical spine protrusion. Tr. 302. Tejedor was admitted to the hospital that night. Tr. 319.

On November 2, an Industrial Hospital physical therapist evaluated Tejedor, noting that she suffered from problems with pain, muscle spasms, numbness, muscle strength, and movement limitation. Tr. 304. Muscle spasms were severe, and numbness affected the upper extremity. *Id.* On a pain scale from zero to ten with zero representing "no pain" and ten representing "unbearable" pain, the physical therapist noted that Tejedor's pain was a ten. *Id.* The physical therapist observed pain in the cervical area and left upper extremity and found that "severe pain increases with every movement in each plane." *Id.* Tejedor's ambulation occurred "without difficulty," but her gate was "affected" with a slow cadence. *Id.* Postural responses to sitting were good, but those to standing and walking were poor. Tr. 305. Tejedor could tolerate sitting for eleven to thirty minutes, standing for six to ten minutes, and walking for six to ten minutes. Tr. 305. On the same day, an MRI of Tejedor's cervical spine revealed "early degenerated disc disease with bulging annulus fibrosus at C3-C4 and C5-C6." Tr. 303. Otherwise, the cervical spine was normal without evidence of disc herniation. *Id.*

It appears that Tejedor was discharged from Industrial Hospital on November 5, with prescriptions for certain illegible medications and a final diagnosis of left shoulder tendonitis and bulges at C3-C4 and C5-C6. Tr. 294–295, 312–13.

Tejedor completed a bone scan on December 12. Tr. 949. "Whole-body bone images" revealed "increased tracer activity" at numerous joints and tarsal bones "diffusely compatible with mild degenerative arthritic changes" as well as "patchy degenerative changes throughout the mid thoracic spine at multiple costovertebral joints as well as the lower lumbar spine." Tr. 949-50. Dr. Adrian Alvarez de la Campa determined that the scan revealed degenerative changes as well as "soft tissue hyperemia at left shoulder compatible with inflammatory changes." Tr. 950.

On December 14, Tejedor saw Dr. Marco R. Perez Toro for pain management. Tr. 292. His notes are partially illegible but demonstrate that he interpreted the bone scan, finding that it indicated shoulder inflammation, shoulder tendonitis, and shoulder impingement. Tr. 292. He created a plan for Tejedor that included follow-up for pain management and the resumption of physical therapy. *Id.* At another appointment on January 25, 2013, Dr. Perez Toro recorded out of proportion left shoulder pain, noted that an MRI indicated rotator cuff tendonitis, and diagnosed Tejedor with shoulder tendonitis and possible RSD. Tr. 56, 290–91. By March 8, she reported lessening pain, Tr. 288, but on April 13, she reported that her symptoms were worsening. Tr. 438.

SIF discharged Tejedor on April 23. Tr. 395. The assessment was as follows: C/D/L strain, left shoulder strain, left knee sprain, right S1 radiculopathy, disc protrusion (C2-C3, C3-C4, C4-C5), disc bulges (C5-C6, C6-C7), and left shoulder bursitis and tendonitis. Tr. 398. At the time of discharge, Tejedor had seen a physiatrist, an orthopedist, an anesthesiologist, received intramuscular injections, and received the maximum number of physical therapy sessions. Tr. 399. She was discharged "with disability," including a ten percent permanent partial disability in the left arm and ten percent partial disability due to loss of general physiological functions. Tr. 399. Her discharge plan included prescriptions for Neurontin, Cataflam, and Ultram. Tr. 399.

Tejedor also received medical treatment from Dr. Roberto Alvarez Swihart, beginning shortly after her visit to Industrial Hospital. She had an appointment with Dr. Alvarez on November 21, 2012, presenting with complaints of neuropathy, shoulder pain, and joint pain for three years. Tr. 1003. She reported that her symptoms were worsened by walking, standing, and lifting, and that they improved with rest. Tr. 1003. Dr. Alvarez described Tejedor's musculoskeletal system as positive for generalized aches; identified 17 of 18 tender points; and recorded pain in Tejedor's left hand, right wrist, left arm, right elbow, left elbow, and right lumbar, and cervical area. Tr. 1004. He otherwise described her musculoskeletal system as normal and found that both her reflexes and grip were normal. Tr. 1004. Dr. Alvarez diagnosed Tejedor with osteoarthritis in several sites, lower

leg joint effusion, enthesopathy of the hip region, unspecified shoulder bursa or tendon disorder, and unspecified rheumatism and fibrositis. Tr. 1005. Tejedor saw Dr. Alvarez again on February 20, 2013, when he made the same musculoskeletal findings and prescribed Cataflam and Baclofen. Tr. 1005–09. On May 15, Dr. Alvarez made the same musculoskeletal findings and added the following diagnoses: degeneration of cervical intervertebral disc, displacement of cervical intervertebral disc without myelopathy, degeneration of lumbar disc, and diverticulosis of colon. Tr. 1013. He also prescribed Elavil. Tr. 1013. Tejedor had similar appointments with Dr. Alvarez several times through December 17, 2015. Tr. 105, 202–04, 1019, 1074–75, 1082–84, 1078–80, 1087–88, 1090–92, 1095–97, 1099–1101. Often, he prescribed Carafate and Zanaflex and administered arthrocentesis aspiration and/or injection in a major joint or bursa. *See, e.g.*, Tr. 1083–84. On April 24, 2015, Dr. Alvarez described Tejedor as follows: "This patient is disabled to work since July 2011. Diagnosis Fibromyalgia [illegible] cervical and lumbar radiculopathy, carpal tunnel syndrome, major depression. [illegible]. She will be disabled for an indefinite period. It [will] probably be permanently." Tr. 696, 1094.

Tejedor also sought treatment from Dr. Javier E. Isla Llamas, whose notes are largely illegible. *See* Tr. 1047–53.

On November 4, 2014, Tejedor underwent a nerve and electromyographic study, which revealed evidence of bilateral C5 and C6 radiculopathy and left L5 and bilateral S1 radiculopathy. Tr. 119. The electrodiagnostic study was compatible with carpal tunnel syndrome. *Id.*

During her eligible period, Tejedor also received two non-invasive venous studies of the lower extremities, neither of which revealed abnormalities. Tr. 940–41, 964–68.[1]

---

[1] Although the record also includes evidence of treatment for a mental impairment, I do not discuss it here, as Tejedor has raised no arguments related to her mental condition.

On June 14, 2013, the Commissioner denied Tejedor's claim for disability benefits. Tr. 560, 773. The initial denial occurred shortly after Dr. Benjamin Cortijo, a non-examining state agency medical reviewer, assessed the medical evidence. *See* Tr. 763. Dr. Cortijo, believing that the date last insured was December 31, 2012, found that there was insufficient evidence to show Tejedor suffered from any medically determinable impairment. *Id.* He also noted that electronic folders purporting to contain material from Dr. Roberto Alvarez Swihart and APS Healthcare of Puerto Rico were both empty. *Id.* Upon reconsideration, Dr. Cristina Ortiz again operated on the assumption that Tejedor's date last insured was December 31, 2012. Tr. 771. Like Dr. Cortijo, she determined that there was insufficient evidence to find that Tejedor suffered from a medically determinable impairment, as there was no physical examination. *Id.* She found that Dr. Cortijo's "initial assessment was technically and substantively correct and addressed all required issues," and she affirmed his assessment "as written." *Id.* The Commissioner denied Tejedor's claim again on reconsideration. Tr. 565.

Tejedor then requested a hearing before an ALJ, Tr. 786–87, which was held on February 5, 2016. Tr. 531. During the hearing, Tejedor testified that she suffers from herniated discs, neck pain, bursitis and tendonitis in the left shoulder, numbness in the hands and feet, radiculopathy, fibromyalgia, and emotional conditions. Tr. 538–41. She explained that she suffered a workplace accident in June 2011, which caused pain in the neck, shoulder, back, and knee, and that subsequent treatments exacerbated her pain and caused her to lose mobility and strength in her hands and feet. Tr. 537–39. Tejedor testified that after a lumbar injection caused her to lose mobility and strength around October 2012, she stopped working, stopped driving, and would only leave home to go to medical appointments. Tr. 541. Tejedor also stated that her left shoulder was weak, her fingers were numb, and she suffered from pain that runs from her neck to her shoulders. Tr. 539. She described suffering from pain all day, every day, all the time. Tr. 540. On a scale of zero to ten, with zero being no pain and ten being the maximum, she rated the pain as an eight. Tr. 540. She

also testified, however, that the pain can vary to some degree, from moderate to severe. Tr. 546–47. She further explained that she uses a cane prescribed by a physical therapist and takes Neurontin, Effexor, Klonopin, Lamictal, Prednisone, and Advil for her fibromyalgia and pain. Tr. 543.

The ALJ issued a written decision on February 25, 2016. Tr. 34–40. At step one, he found that Tejedor did not engage in substantial gainful activity from October 2, 2012 through June 30, 2013, her date last insured. Tr. 36. At step two, he found that Tejedor was not disabled under the Act, concluding that no medical signs or laboratory findings substantiated the existence of a medically determinable impairment. Tr. 36. The ALJ first determined that any evidence dated before the alleged onset date or after the date last insured was irrelevant, as "it was the claimant's burden to show that she was disabled within the period considered." Tr. 37. He acknowledged "RA, Anti DNA, and Antinuclear antibodies tests that were negative," as well as two non-invasive arterial studies with normal findings. Tr. 37–38. He also stated that the bone scan Tejedor underwent "revealed mild degenerative arthritic changes" and acknowledged that Tejedor twice sought pain treatment at Centro de Salud Mario Canales and received prescriptions to improve her pain. Tr. 38. The ALJ also acknowledged that Dr. Alvarez identified 17 of 18 tender points; described Tejedor's musculoskeletal system, grip, and reflexes as normal; and diagnosed Tejedor with osteoarthritis, joint effusion, enthesopathy, unspecified shoulder bursa, rheumatism, NOS, degeneration of cervical and lumbar disc, and diverticulosis of colon. Tr. 38. In reaching his conclusion, the ALJ stated that he gave great weight to the opinion of Dr. Ortiz, the non-examining state agency medical reviewer. Tr. 38. Ultimately, the ALJ concluded that Tejedor's claimed limitations were not corroborated by the medical evidence and that her subjective complaints alone could not establish a medically determinable impairment. Tr. 39.

Tejedor sought review with the Appeals Council, submitting to the Council an additional 235 pages of evidence. Tr. 8. The Council denied review, making the ALJ's decision the SSA's final decision. Tr. 7.

## DISCUSSION

Tejedor contends that the Commissioner erred in finding her not disabled at step two. She faults the ALJ for (1) failing to identify evidence of medical signs and laboratory findings indicating that she suffers from a medically determinable impairment and (2) resting his decision on the medical opinion of Dr. Ortiz, a non-examining state agency physician who failed to consider six months' worth of evidence. She also submitted a significant amount of medical evidence to the Appeals Council, which, she contends, required that the Commissioner continue with the five-step evaluation process. The Commissioner argues that the ALJ properly found the record devoid of objective medical evidence to substantiate a medically determinable impairment and permissibly relied on Dr. Ortiz's medical opinion and that the Appeals Council correctly applied the relevant standard in denying review.

Before addressing these arguments, I note that the ALJ stated that any evidence dated before the alleged onset date or after the date last insured was "irrelevant," as "it was the claimant's burden to show that she was disabled within the period considered." Tr. 37. This is not an accurate statement of the law. Certainly, the claimant bears the burden of proving that she was disabled during the coverage period. *See Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). That fact, however, does not render all evidence dated outside the coverage period irrelevant. Instead, evidence is relevant insofar as it sheds light on the question of disability within the coverage period, although evidence dated outside that period may have less probative value, depending on the circumstances. *See Frustaglia v. Sec'y of Health & Human Servs*., 829 F.2d 192, 193 (1st Cir. 1987) (explaining that "the ALJ is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary

to determine whether the claimant was disabled at the time of his second application"); *Patoski v. Berryhill*, 320 F. Supp. 3d 283, 291 (D. Mass. 2018), *aff'd*, No. 18-1904, 2019 WL 2574591 (1st Cir. June 24, 2019) (quoting *Rivera v. Sec'y of Health & Human Servs.*, 19 F.3d 1427 (1st Cir. 1994) (unpublished table opinion)) ("The ALJ may consider medical evidence after the DLI 'for what light (if any) it sheds on the question whether claimant's impairment(s) reached disabling severity before claimant's insured status expired.'"); *see also Davidson v. Colvin*, 164 F. Supp. 3d 926, 941–42 (N.D. Tex. 2015) (collecting cases); *Wilson v. Colvin*, 17 F. Supp. 3d 128, 139–40 (D.N.H. 2014) (collecting cases); *Casull v. Comm'r of Soc. Sec.*, No. CV 16-1620 (MEL), 2017 WL 5462185, at *4–5 (D.P.R. Nov. 14, 2017) (permitting medical evidence outside the coverage period but finding that medical evidence pre-dating the alleged onset date by more than ten years did not support plaintiff's claim of severe impairment). Thus, the ALJ should have considered medical evidence dated outside the coverage period if it shed light on Tejedor's disability during that period. As explained below, some of that evidence is indeed relevant.

In this case, the ALJ stopped his analysis at step two. The step two severity test acts as a de minimis screening policy for the Commissioner to screen out groundless claims that would clearly result in a finding of non-disability, even if vocational factors were considered. *McDonald v. Secretary of Health and Human Services*, 795 F.2d 1118, 1125–1126 (1st Cir. 1986) (citing SSR 85-28). The ALJ may deny a claim at step two "only where 'medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education or work experience were specifically considered.'" *May v. Soc. Sec. Admin. Comm'r*, 125 F.3d 841 (1st Cir. 1997) (per curiam) (unpublished table decision) (quoting *Barrientos v. Sec'y of Health & Human Servs.*, 820 F.2d 1, 2 (1st Cir. 1987)). Step two demands a determination of two things: (1) whether a claimant has a medically determinable impairment or combination of impairments, and (2) whether the impairments or combination of impairments is severe, that is, that it significantly limits

or is expected to significantly limit the ability to perform basic work-related activities for twelve consecutive months. *Bowen v. Yuckert*, 482 U.S. 137, 140–41 (1987); 20 C.F.R. §§ 404.1520(a)(4)(ii) & 404.1520(c); 20 C.F.R. § 404.1521. A medically determinable impairment or combination of impairments "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521. It "must be established by objective medical evidence from an acceptable medical source," and cannot be based on a claimant's "statement of symptoms, a diagnosis, or a medical opinion." *Id.* "Objective medical evidence means signs, laboratory findings, or both." 20 C.F.R. § 404.1502(f). "Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [symptoms]." 20 C.F.R. § 404.1502(g). "Laboratory findings means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques." 20 C.F.R. § 404.1502(c). "Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X–rays), and psychological tests." *Id.*

Here, the ALJ concluded that no medical signs or laboratory findings substantiated the existence of a medically determinable impairment.[2] In reaching this conclusion, he explained that results of "RA, Anti DNA, and Antinuclear antibodies tests" were negative and accurately stated that results of non-invasive arterial studies were normal. Tr. 37–38. He also explained that the

---

[2] In reviewing the ALJ's decision, I limit my discussion to the record that was before him and address evidence submitted to the Appeals Council below. *See Mills v. Astrue*, 244 F.3d 1, 5 (1st Cir. 2001) ("[W]e agree with the Commissioner's view that we may review the ALJ decision solely on the evidence presented to the ALJ."); *see also id.* ("The ALJ has not 'made a mistake' in ignoring new evidence that was never presented to him.").

record included "objective evidence" dated before the alleged onset date "that revealed mild, early, or small findings" but offered no further discussion. Tr. 37. That evidence included a December 2011 cervical MRI that revealed protruding discs at C2-C3, C3-C4, and C4-C5, and bulging discs at C5-C6 and C6-C7. Tr. 961. It also included a left should MRI that revealed "fluid in the subacromial subdeltoid bursa suggest[ing] bursitis," indicated "mild to moderate rotator cuff tendinopathy changes," and suggested early AC joint degenerative joint disease "with small undersurface osteophytes at the distal clavicle predisposing to mechanical impingement." Tr. 962. That evidence also included a December 2011 electromyogram and nerve conduction study that revealed "reduced amplitude" in left and right median motor nerves as well as in the left and right tibial motor nerves. Tr. 957. A comparison between the left and right tibial motor nerves indicated abnormal left/right amplitude differences. *Id.* The MRI, electromyogram, and nerve conduction studies are all objective medical evidence revealing anatomical or physiological abnormalities corroborating the existence of a medically determinable impairment. *See* 20 C.F.R. § 404.1521; *see Cruz v. Comm'r of Soc. Sec*., No. CIV. 11-1945 CVR, 2013 WL 592301, at *9 (D.P.R. Feb. 14, 2013) (treating results of EMG and MRI imaging as objective medical evidence). Indeed, Dr. Javier Isla Llamas referred to the MRI in finding that Tejedor suffered from tendinopathy. Tr. 938. And Dr. Luis Goveo, determined that the electromyogram and nerve conduction studies provided evidence of "a bilateral median and tibial motor axonal neuropathy" and "acute right SI radiculopathy." Tr. 957. Although these tests pre-date the alleged onset date by ten months, they are nonetheless relevant to determining whether Tejedor's alleged impairments are corroborated by objective medical evidence. This is particularly true where, as here, a claimant alleges that she had a pre-existing condition later aggravated by injury and medical procedures, which ultimately led to disability. It was thus error for the ALJ to ignore this evidence in finding the record devoid of objective medical evidence substantiating the existence of a medically determinable impairment.

Further, in reaching his decision, the ALJ also overlooked medical evidence dated within the coverage period that revealed signs of a medically determinable impairment. The record included progress notes from Dr. Alvarez, who repeatedly found that Tejedor's musculoskeletal system was positive for generalized aches; recorded pain in Tejedor's left hand, right wrist, left arm, right elbow, left elbow, and right lumbar, and cervical area; and identified 17 of 18 tender points. Tr. 1004–13. Although the ALJ was correct to explain that symptoms alone are insufficient to establish a severe impairment, 20 C.F.R. § 404.1529(a), he did not explain whether Dr. Alvarez's records reflected Tejedor's description of her symptoms or clinical observations of physiological abnormalities (i.e. "signs"). *See Webb v. Berryhill*, 294 F. Supp. 3d 824, 877–81 (D.S.D. 2018) (remanding for further consideration of claimant's musculoskeletal problems at step two where ALJ deemed those problems unsubstantiated by medical evidence but had overlooked doctor's record of low back pain upon testing); *Gilliland v. Colvin*, 67 F. Supp. 3d 308, 319 (D.D.C. 2014) (assigning error where ALJ failed to explain whether doctor's observation that injection caused "dramatic relief of pain" was a sign, elicited by the doctor, or based on symptoms reported by claimant). Moreover, although the ALJ acknowledged that Tejedor presented with 17 of 18 tender points, he did not recognize them as signs of any impairment. Tr. 38. Tender points, however, are signs of fibromyalgia, with which Tejedor had been diagnosed.[3] *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (citing American College of Rheumatology ("ACR") guidelines stating that signs and symptoms that support a diagnosis of fibromyalgia include "widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body," and

---

[3] Although Tejedor does not raise the issue, I note the ALJ failed to apply the Commissioner's protocol in assessing fibromyalgia. *See Revels v. Berryhill*, 874 F.3d 648, 656–57 (9th Cir. 2017) (discussing the difficulties inherent in assessing fibromyalgia and explaining SSA requirements addressing the same); *Sinclair v. Berryhill*, 266 F. Supp. 3d 545, 552–54 (D. Mass. 2017) (same).

an SSA Memorandum explaining that "signs for fibromyalgia, according to the ACR, 'are primarily the tender points.'"). Additionally, although the ALJ mentioned a three-phase bone scan, he treated that scan as normal because it revealed only mild degenerative arthritic changes. Tr. 38. But he did not rely on a medical opinion in concluding that mild degenerative arthritic changes are normal. And he did not mention that the same bone scan also revealed "patchy degenerative changes throughout the mid thoracic spine at multiple costovertebral joints as well as the lower lumbar spine" as well as "soft tissue hyperemia at left shoulder compatible with inflammatory changes." Tr. 949–50. *See Money v. Astrue*, 515 F. Supp. 2d 1211, 1217 (D. Kan. 2007) (identifying ALJ error where ALJ failed to accurately report test results). Although the ALJ ceased his analysis at step two after finding the record devoid of objective medical evidence substantiating a medically determinable impairment, the records detailed above document both medical signs and laboratory findings indicating otherwise. The ALJ's conclusion, therefore, can only stand if we ignore this evidence. Accordingly, that conclusion is not supported by substantial evidence. *See Nguyen v. Chater*, 172 F. 3d 31, 35 (1st Cir. 1999) (an ALJ is not at liberty to "ignore medical evidence"); *see also* 20 C.F.R. § 404.1520(a) ("In making a determination as to whether a claimant is disabled, all of the evidence in the record must be considered.").

Additionally, the ALJ's decision rests on a single medical opinion—that of Dr. Ortiz, a non-examining state agency physician. The evidentiary weight due such opinions "will vary with the circumstances, including the nature of the illness and the information provided the expert." *Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir. 1991) (quoting *Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 223 (1st Cir.1981)) (internal quotation marks omitted). In this case, Dr. Ortiz's assessment was based on an incomplete record. She wrongly believed that Tejedor's date last insured was December 31, 2012, when in fact it was June 30, 2013, and she never considered much of the medical evidence. For instance, Dr. Ortiz did not consider the bone scan that revealed "increased tracer activity at the bilateral common clavicular

joints, mildly and glenohumeral joints, sternoclavicular joints, the elbows, the wrists, knees at patellofemoral joints and tarsal bones diffusely compatible with mild degenerative arthritic changes," "patchy degenerative changes throughout the mid thoracic spine at multiple costovertebral joints as well as the lower lumbar spine," and "soft tissue hyperemia at left shoulder compatible with inflammatory changes." Tr. 949–50. Nor is there any indication that she reviewed records from Dr. Alvarez, who had described Tejedor as positive for generalized aches and identified 17 of 18 tender points. *See* Tr. 771. As a layperson, I cannot say whether review of these records would change Dr. Ortiz's opinion. However, I can say that Dr. Ortiz's opinion, resting on such an incomplete medical record, cannot provide substantial evidence to support the Commissioner's decision. *See Mary K v. Berryhill*, 317 F. Supp. 3d 664, 667–68 (D.R.I. 2018) (ALJ denial was not based on substantial evidence where ALJ relied exclusively on non-examining state agency physicians who did not have the entire record before them when forming their opinions); *see also Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996) (explaining that generally, "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record" unless a "commonsense judgment" can be made "without a physician's involvement").

Finally, I address Tejedor's contention that evidence submitted to the Appeals Council should have changed the Commissioner's decision. On review before the Appeals Council, Tejedor submitted 235 additional pages of evidence, but the Council declined review. Tr. 8. The Appeals Council must review a case if it receives "additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5). In this Circuit, an Appeals Council refusal to review an ALJ decision is not reviewable unless the Council "gives an egregiously mistaken ground for this action." *Mills v. Apfel*, 244 F.3d 1, 5 (1st Cir. 2001). Thus, if it is apparent that "the Appeals Council mistakenly rejected the new evidence

on the ground that it was not material, . . . a court ought to be able to correct that mistake." *Id.* at 6. If the supplementary evidence is starkly inconsistent with the ALJ's determination, and undermines it, the Appeals Council's denial of review constitutes an egregious mistake. *Orben v. Barnhart*, 208 F. Supp. 2d 107, 109–11 (D.N.H. 2002).

Here, the ALJ ceased his analysis at the step two threshold, finding the record lacking in relevant objective medical evidence. New evidence submitted to the Appeals Council, however, contained exactly what the ALJ found lacking. That evidence included a November 2012 MRI, which revealed "early degenerated disc disease with bulging annulus fibrosus at C3-C4 and C5-C6." Tr. 303. It also included a nerve and electromyographic study, which revealed evidence of bilateral C5 and C6 radiculopathy and left L5 and bilateral S1 radiculopathy, compatible with carpal tunnel syndrome. Tr. 119. And numerous medical records documented the fact that Tejedor has bulging and/or protruding discs—an observable physiological abnormality. *See, e.g.*, Tr. 294–295, 302, 320, 395, 398, 312–13. The presence of these signs and laboratory findings in the newly submitted evidence undermines and contradicts the ALJ's conclusion that no such objective evidence substantiated any medically determinable impairment.

Additionally, the new medical evidence documented in some detail the time surrounding Tejedor's alleged onset date—when she claims an injection rendered her unable to continue working—and through her visit to the emergency room and hospital admission. No non-examining state agency physician reviewed these records, which tend to corroborate Tejedor's allegations of increasing pain and limited mobility during this time and which include physical examination documenting additional medical signs of impairment, such as muscle spasms and various physical limitations. *See* Tr. 302–05. The new evidence also included Tejedor's SIF discharge papers, which document a diagnosis of C/D/L strain, left shoulder strain, left knee sprain, right S1 radiculopathy, disc protrusion (C2-C3, C3-C4, C4-C5), disc bulges (C5-C6, C6-C7), and left shoulder bursitis and tendonitis, and which concluded that Tejedor would be discharged "with disability," including

a ten percent permanent partial disability in the left arm and ten percent partial disability due to loss of general physiological functions. Tr. 398–99. Again, no non-examining state agency physician ever reviewed these records. This fact further undermines the ALJ's exclusive reliance on Dr. Ortiz's opinion, as she did have any of these records before her when she formed that opinion. Nonetheless, the Appeals Council denied review, finding that none of the newly submitted evidence demonstrated a reasonable probability of changing the outcome of the ALJ's decision. That determination was egregious error meriting remand, as the new evidence seriously undermined and contradicted the ALJ's decision.

I do not intimate that Tejedor will succeed in establishing that she is disabled and entitled to benefits. I simply find that the ALJ lacked substantial evidence to deem the record devoid of objective medical evidence substantiating the existence of a medically determinable impairment. The ALJ should have continued the sequential analysis. Further, the Appeals Council erred in overlooking the ways in which new evidence undermined and contradicted the ALJ's opinion.

Pursuant to sentence four of 42 U.S.C. § 405(g), I remand this matter to afford the ALJ the opportunity to revisit his disability determination in light of the evidence provided to the Appeals Council, and for further proceedings consistent with this opinion, including, as necessary, the development of the record, consistent with an ALJ's duties in this non-adversarial process. *See Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir. 2001) (citing *Sims v. Apfel*, 530 U.S. 103, 110 (2000)) (the ALJ has a duty to "investigate and develop the facts and develop the arguments both for and against the granting of benefits"); *Heggarty v. Sullivan*, 947 F.2d 990, 997 (1st Cir. 1991) (duty to develop the record is heightened "where there are gaps in the evidence necessary to a reasoned evaluation of the claim") (citation omitted).

Tejedor-Davila v. Commissioner of Social Security, Civil No. 18-1630 (BJM)                    21

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **VACATED**, and the matter is **REMANDED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 6th day of August, 2020.


*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge